[Cite as *Parma VTA, L.L.C. v. Parma GE 7400, L.L.C.*, 2025-Ohio-3279.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

PARMA VTA, LLC,                          :

    Plaintiff-Appellee,           :

                           No. 114601

    v.                            :

PARMA GE 7400, LLC,                      :

    Defendant-Appellant.          :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** September 11, 2025

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case Nos. CV-14-829946, CV-20-927487, and CV-20-929948

---

### *Appearances:*

McCarthy, Lebit, Crystal & Liffman Co., L.P.A., and Mark
I. Wallach, and Lawrence R. Acton, *for appellee.*

Zagrans Law Firm LLC, and Eric H. Zagrans; Goldberg
Legal Co., L.P.A., and Steven M. Goldberg, *for appellant.*

MARY J. BOYLE, P.J.:

{¶ 1} In this appeal, we are asked to determine whether the trial court erred when it confirmed two arbitration awards (the "Arbitration Award") resulting from an 11-year legal battle between the parties that is currently before this court for the fifth time. Initially, the trial court denied the applications of plaintiff-appellee

Parma VTA, LLC ("Parma VTA") to confirm, and granted the motion to vacate the Arbitration Award by defendant-appellant Parma GE 7400, LLC ("GE 7400"). The trial court's judgment was reversed by this court in *Gerston v. Parma VTA, LLC,* 2023-Ohio-1563 (8th Dist.) ("*Gerston III*"), and the matter was remanded for the trial court to rule on GE 7400's two remaining arguments in support of its motions to vacate. In the interim, the matter proceeded to a jury trial on damages in May 2022, and resulted in a verdict in favor of Parma VTA. GE 7400's appeal of the verdict was affirmed by this court in *Gerston v. Parma VTA, LLC*, 2024-Ohio-3005 (8th Dist.) ("*Gerston IV*"). Following *Gerston IV*, the trial court granted Parma VTA's application to confirm the Arbitration Award, awarded Parma VTA a lien in the amount of $4,815,623.26 against GE 7400's interest in the real estate ("Property") jointly owned by the parties, and awarded Parma VTA $105,144.06 in attorneys' fees and other and expenses. For the reasons set forth below, we affirm the trial court's judgment.

## I. Facts and Procedural History

### A. *Gerston I — Gerston IV*

{¶ 2} The factual and procedural history underlying this appeal was previously set forth by this court in *Gerston v. Parma VTA, L.L.C.*, 2018-Ohio-2185 (8th Dist.) ("*Gerston I*"), *Gerston v. Parma VTA, L.L.C.*, 2020-Ohio-3455 (8th Dist.) ("*Gerston II")*, *Gerston III* and *Gerston IV* as follows:

> This [is] a complex civil case that was initiated in 2014 by plaintiff-appellee Kimberlee Gerston ("Kimberlee"), Trustee of the Gerston Family Trust ("the Trust"), against the above-named defendants, as

well as appellee Parma GE 7400. . . . Parma GE 7400 eventually became a plaintiff in this litigation.

The Trust was formed in 2002 under California laws by husband Kenneth Gerston ("Gerston") and wife Kimberlee. Each was designated as the primary trustee, and in the event of the death of one of them, the survivor was to continue to act as the primary trustee. Gerston died in 2010, and, thereafter, Kimberlee assumed the role of primary trustee.

Prior to Gerston's death, he and [Allan] Robbins had been negotiating the purchase of the centerpiece of this litigation — commercial property located at 7400 Broadview Road, Parma, Ohio [Property]. Gerston and Robbins formed companies for the sole purpose of effectuating the sale; Gerston's company was Parma GE 7400 and Robbins's company was Parma VTA. Robbins and Gerston entered into a Tenants-in-Common Agreement ("TIC Agreement"), which set forth the terms of the administration of the property and the nature of the parties' relationship. [U]nder the TIC Agreement "[a]ny controversy arising out of or related to this Agreement or the breach thereof or an investment in the interests shall be settled by arbitration in Cuyahoga County * * *."

*Gerston II* at ¶ 3-5.

[Further, under the TIC], Gerston's company, Parma GE 7400, would own a 76.62% majority interest in the property, and Robbins company, Parma VTA, would own a minority 23.28% interest in the [P]roperty.

The purchase price for the [P]roperty was approximately $11 million. In order for the purchase to be effectuated, Gerston and Robbins had to assume the existing loan on the property, which had a principal sum of approximately $8.2 million. The assumption of the previous owner's loan was set forth in a Consent to Transfer and Loan Assumption Agreement, dated October 4, 2005, that was the closing date for the transaction. The document was signed by Gerston and Robbins as presidents of their respective entities, and each was designated as borrowers and guarantors for the purchase of the property — a requirement of the mortgage lender that was set forth under the Consent to Transfer and Loan Assumption Agreement. Gerston and Robbins then had to pay the approximate difference between the $8.2 million previous loan and the $11 million purchase price.

The loan was a nonrecourse loan, but set forth specific circumstances under which Gerston and Robbins would be fully personally liable as guarantors in the event of default [footnote omitted]. One such circumstance was if there was an unpermitted transfer, assignment, or relinquishment of ownership interest in Parma GE 7400.

To pay the approximate difference between the purchase price and the existing loan amount, Robbins put $500,000 earnest money in escrow in February 2005, and that money was applied toward the purchase price. The two agreed that Robbins and/or one of his business entities would loan the entirety of the equity portion necessary for the purchase to Parma GE 7400 (Gerston's company).

Under the Consent to Transfer and Loan Assumption Agreement, the mortgage lender imposed limitations on the ability to transfer the parties' respective interests in the property. For example, they were restricted from (1) selling or transferring all or any portion of their respective interests in the property without the prior consent of the mortgage lender; and (2) transferring ownership of member interest in their respective companies.

As mentioned, the purchase of the [P]roperty closed on October 4, 2005. The TIC Agreement contained an integration clause, which provided that no modification, waiver, or amendment would be valid unless it was in writing and signed. The TIC Agreement, Consent to Transfer and Loan Assumption Agreement, mortgage, and limited warranty deed were all recorded in the Cuyahoga County Recorder's Office.

The parties also entered into an Operating Agreement so that their respective business entities could set forth rules that it wanted the parties to follow. Relative to Parma GE 7400, the Operating Agreement, that was signed by Gerston on October 3, 2005, stated the sole purpose of establishing Parma GE 7400 was to acquire property and assume the $8.2 million loan.

. . .

In August 2010, Gerston passed away; at the time of his death he was the sole member of Parma GE 7400. . . .

In early 2014, unbeknownst to Kimberlee or the Trust, Robbins attempted to sell a portion of Parma GE 7400's 76.62% interest in the property to potential buyers. The potential buyers and their counsel

raised the issue with Robbins about who owned the 76.62% interest in the property. To address their concern, counsel who had previously worked with both Gerston and Robbins when they initially purchased the property, drafted an Assignment of Interest that stated that Gerston was the sole owner of Parma GE 7400 until his death, upon which his interest passed to Kimberlee as Gerston's sole heir and legal representative. Counsel was never able to locate any documentation that Gerston had transferred his interest in Parma GE 7400 to any person or entity, including Robbins or AKMS [another Robbins's entity]. In fact, as of 2014, the recorded Consent to Transfer and Loan Assumption showed that Gerston was the guarantor on the $8.2 million loan.

The record demonstrates that Robbins contacted Kimberlee and asked her to execute a Declaration, under which she would have disavowed any financial or ownership interest in the property, and declared that the "Company" (i.e., Parma GE 7400) was owned by AKMS, Robbins's business. Kimberlee refused to sign the Declaration. She requested proof from Robbins that Gerston had assigned or transferred his interest in Parma GE 7400 to Robbins or AKMS.

Kimberlee never received any such proof from [Parma VTA and AKMS], but they filed a Certificate of Amendment with the Secretary of State of Delaware [Parma GE 7400 was incorporated in Delaware], amending Parma GE 7400's certificate of formation to name AKMS as the sole member of Parma GE 7400. Kimberlee maintains that neither she nor the Trust consented to the amendment.

In 2014, Parma VTA (Robbins's entity) refinanced the loan on the property with Ladder Capital, which was not a party to this action, and the original loan with Global, who also was not a party to the action, was paid off on behalf of Parma GE 7400 and Parma VTA. Additionally, there was a lease between Parma GE 7400 and Parma VTA, as lessors, and Giant Eagle, as lessee.

In 2016, defendant-appellant Leah (Robbins's daughter) signed a Limited Warranty Deed, transferring Parma GE 7400's 76.62% interest in the property to Parma VTA. Again, Kimberlee contends that all of these transactions were done without her knowledge or consent.

*Gerston I* at ¶ 6-18.

After Gerston's death, ownership of Parma GE 7400 became an issue and Kimberlee filed [the underlying] action. In Count 1 of her

complaint, Kimberlee sought a declaratory judgment declaring the Trust to be the owner of Parma GE 7400. At [Parma VTA's] behest, the declaratory judgment portion of the case was bifurcated from the rest of the case and was tried in a bench trial; [Parma VTA] did not mention the possibility of arbitration. [Its] motion requested that the "issue of who the owner of [Parma GE 7400] be decided first, and all claims flowing from that determination — whether Plaintiff's or Defendants' — be bifurcated and tried separately."

*Gerston II* at ¶ 6. The matter proceeded to a bench trial on the declaratory judgment portion of the case in December 2016 ("Phase I"). "Phase II," which addressed the damages portion, proceeded to trial in May 2022.

{¶ 3} Following the conclusion of Phase I, the court found that the Trust was the majority legal owner of GE 7400. *Id.* at ¶ 7. In June 2018, this court affirmed that ruling, finding that "[t]here simply is no evidence in the record of any writing signed by Gerston (or the Trust) assigning or conveying GE 7400's interest to any person or entity." *Gerston I* at ¶ 54. In reaching our conclusion, the *Gerston I* court determined

> after Gerston's death, in 2014, Parma VTA (Robbins's entity) refinanced the loan on the property with Ladder Capital, which was not a party to this action, and the original loan with Global, who also was not a party to the action, was paid off on behalf of Parma GE 7400 and Parma VTA. Additionally, there was a lease between Parma GE 7400 and Parma VTA, as lessors, and Giant Eagle, as lessee; Parma GE 7400 assigned its rights under the lease to Parma VTA.

*Id.* at ¶ 36.

{¶ 4} Following our decision in in *Gerston I*, GE 7400 transitioned from status as a defendant to joining Kimberlee as a plaintiff, and on March 8, 2019, Kimberlee and GE 7400 filed a supplemental complaint, alleging "claims for damages stemming from [Parma VTA's] alleged conduct, including damages for

'fraudulent conduct,' tortious interference with a business relationship or economic interest, intentional infliction of emotional distress, and restitution of the withheld distributions that appellants should have received under the TIC Agreement. [GE 7400] also sought a declaration that GE 7400 is the sole manager of the property." *Gerston IV* at ¶ 21.

{¶ 5} On April 11, 2019, Robbins, Leah, Parma VTA, and AKMS filed an answer, along with counterclaims, to the supplemental complaint. The answer asserted many affirmative defenses, including that some of the counts of the supplemental complaint were subject to arbitration under the TIC Agreement. This "was the first time in the five years of litigation that [Parma VTA] mentioned the arbitration provision." *Gerston II* at ¶ 8. In their counterclaim, Parma VTA alleged that in 2005, it "made an unsecured loan to the GE 7400 in the amount of $2,464,000 and that Kenneth and Robbins had agreed to a post-closing interest rate of 10 percent per annum on the loan ('the acquisition loan'). In other words, GE 7400 had not paid anything towards the purchase of the property in question because Parma VTA had fronted the purchase price and GE 7400, allegedly, had not paid that amount back." *Gerston IV* at ¶ 19.

> [Parma VTA] sought "an equitable lien" against GE 7400 in the amount of $2,464,000 plus interest and 'that [GE 7400] disgorge[d] the value of any benefit conferred upon it by [Parma VTA], from any assets that can be traced to such benefits.' They also sought restitution and quantum meruit. The only document attached to the counterclaim was a copy of the judgment entry demonstrating that any claims for damages would be addressed in Phase II.

*Id*. at ¶ 20. Specifically, the counterclaim alleged:

[GE 7400 has] received benefits to which [it is] not entitled, as outlined above, and which include, but are not limited to: (1) ownership of Parma GE 7400 despite putting no money towards the assets Parma GE 7400 owns; (2) that [GE 7400] at all relevant times paid no taxes relating to Parma GE 7400; (3) that [GE 7400] paid no costs and expenses related to the operation of Parma GE 7400; (4) the Acquisition Loan to Parma GE 7400; and (5) other benefits relative to the Property, including, but not limited to, the payoff of the Lender Principal Loan [Global Mortgage] which was assumed by Parma VTA in the amount of approximately $8,087,791.22.

(Defendants' Counterclaim, Apr. 11, 2019.)

{¶ 6} On that same day, April 11th, the defendants also filed a motion for partial stay of proceedings, which was the subject of *Gerston II*.

In the motion, [Parma VTA] contended that "[GE 7400's] Supplemental Complaint, with the participation of newly-realigned Plaintiff [GE 7400], has asserted claims which are clearly subject to the mandatory arbitration provision contained in the [TIC Agreement] between [GE 7400] and [Parma VTA]." Although not directly at issue in this appeal, for full context it is important to note that on April 5, 2019, [Parma VTA] filed a motion to compel arbitration on another matter — a "cash call" that allegedly occurred between two of the parties — but the defendants withdrew the motion to compel on April 17, 2019.

[GE 7400] filed one brief in opposition to both of the above-mentioned motions — the subject motion for partial stay of proceedings and the April 5 motion to compel arbitration on the alleged "cash call" issue. The substance of [GE 7400's] opposition only went to the "cash call" matter, however. The trial court summarily denied [Parma VTA's] motion for partial stay of proceedings without explanation.

*Gerston II* at ¶ 9-10. Subsequently, Parma VTA appealed from the trial court's denial in *Gerston II*. On appeal, it argued "The Trial Court erred in denying [Parma VTA's] Motion for Partial Stay of Proceedings pending arbitration of five claims set forth in [GE 7400's] Supplemental Complaint." *Id.* at ¶ 10.

{¶ 7} In *Gerston II*, we affirmed the trial court's judgment, finding that:

In the instant case, five years elapsed before the defendants even mentioned arbitration. It is true that [GE 7400] realigned, but it was always a party in the case and the TIC Agreement was always at issue. At the very least, [Parma VTA] could have reserved their right to arbitrate. On this record, under the totality of the circumstances, the trial court did not abuse its discretion by denying [Parma VTA's] motion for partial stay of proceedings. Even if we reviewed under the less deferential de novo standard, we would find no error.

*Id.* at ¶ 30.

{¶ 8} While *Gerston II* was pending,

Parma VTA served a demand for arbitration against [GE 7400] regarding Parma VTA's attempt to force [GE 7400] to contribute funds to partially repay a loan from Ladder Capital on the property at issue pursuant to a cash call ("Cash Call Issue") [in May 2019]. Parma VTA also filed a motion in the trial court asking the court to compel arbitration on the Cash Call Issue but later withdrew its motion.

[GE 7400] disputed the arbitrator's jurisdiction to hear the matter, asserting that Parma VTA had waived its right to arbitrate the dispute after participating in litigation for over five years. [GE 7400] participated in the arbitration "under protest" and continued to dispute the arbitrator's jurisdiction.

The arbitrator determined that it did, in fact, have jurisdiction over the matter, found in favor of Parma VTA, and ordered [GE 7400] to repay 77 percent of Parma VTA's loan with Ladder Capital. Parma VTA then filed an application to confirm the award, and [GE 7400] moved to vacate the award, arguing (1) Parma VTA waived arbitration by litigating the parties' ownership and related financial disputes in state court for five years; (2) the arbitrator's award ignores the express and unambiguous terms of the TIC Agreement; and (3) [GE 7400] did not agree to help Parma VTA pay its loan with Ladder Capital.[1]

Parma VTA further sought a supplemental award of attorney fees and costs from the arbitrator, which was granted. Parma VTA filed an application to confirm this award, and [GE 7400] again moved to vacate the award, arguing (1) the supplemental award exceeded the arbitrator's powers because the merits award terminated his

---

[1] Parma VTA, "while purporting to operate on behalf of the GE 7400, refinanced the existing loan with Ladder Capital." *Gerston IV* at ¶ 13.

jurisdiction; and (2) the merits award was defective for the reasons set forth in the original motion to vacate.

The trial court denied the applications to confirm the awards and granted the motions to vacate, holding:

> The court finds that Parma VTA waived the right to arbitrate. Specifically, Parma VTA acted inconsistent with the right to arbitrate by actively participating in five years of litigation within this court related to the ownership, operation, and financial obligations of the property at issue.
>
> While it is true that an arbitration provision is contained in the TIC agreement at issue, Ohio law recognizes that "arbitration is a matter of contract and, like any other contractual provision, can be enforced unless the parties waive that right. A party may explicitly waive its right to arbitration, or may implicitly waive its right by failing to assert it or by participating in litigation to such an extent that its actions are 'completely inconsistent with any reliance' on this right, resulting in prejudice to the opposing party." *Bass Energy Inc. v. City of Highland Hts.*, 193 Ohio App.3d 725, 2010-Ohio-2102, 954 N.E.2d 130, ¶ 33 (8th Dist.).
>
> A totality of the circumstances test is used to determine whether a party has waived its right to arbitrate disputes. The relevant factors for consideration include: (1) whether the party seeking arbitration invoked the jurisdiction of the trial court by filing a complaint, counterclaim, or third-party complaint without asking for a stay of proceedings; (2) the delay, if any, by the party seeking arbitration in requesting a stay of proceedings or an order compelling arbitration; (3) the extent to which the party seeking arbitration participated in the litigation, including the status of discovery, dispositive motions, and the trial date; and (4) any prejudice to the nonmoving party due to the moving party's prior inconsistent actions. *Neel v. A. Perrino Constr., Inc.*, 2018-Ohio-1826, 113 N.E.3d 70, ¶ 34 (8th Dist.).
>
> In April 2019, Parma VTA raised arbitration as an affirmative defense to[GE 7400's] supplemental complaint. It was the first time in five years of litigation that an arbitration provision was mentioned. Parma VTA argues that the arbitration provision was not triggered until [GE 7400] was realigned to be in an adversarial position with Parma VTA. Notwithstanding realignment, the issue of arbitration could certainly have been

raised and addressed prior to 2019. The TIC [A]greement and its arbitration provision was always at issue in this matter.

Lastly, the court acknowledges that there is a strong public policy that favors the use of arbitration to resolve disputes, and that "waiver is not to be lightly inferred." *Harsco Corp. v. Crane Carrier Co.*, 122 Ohio App.2d 406, 414, 701 N.E.2d 1040 (3d Dist.1997). However, consistent with the Court of Appeals decision, this court agrees that Parma VTA's actions throughout this litigation have been completely inconsistent with any reliance on the right to arbitrate.

In conclusion, the court finds that by engaging in extensive litigation of this matter, Parma VTA has acted in a manner inconsistent with the right to seek arbitration and, therefore waived that right. Accordingly, the arbitrator lacked jurisdiction to adjudicate the parties' disputes and the arbitration awards are therefore vacated.

*Gerston III* at ¶ 4-8.

{¶ 9} Parma VTA then appealed in *Gerston III*, challenging the court's decision to vacate the arbitration awards. In reversing the trial court's decision, we noted in *Gerston III* that

While Parma VTA was previously determined to have waived its right to arbitration by litigating the issues between the parties, the difference here, as recognized by this Court in *Gerston II*, is that with the prior issues, "five years elapsed before [Parma VTA] even mentioned arbitration." In the instant matter, the Cash Call Issue arose in March 2019, and Parma VTA sought arbitration soon thereafter. It did not adjudicate the Cash Call Issue through litigation. . . . Parma VTA could not waive arbitration of an issue that had not even occurred yet.

*Id*. at ¶ 17-18. As a result, we concluded that

the trial court erred in vacating the arbitration awards based on its erroneous determination that Parma VTA waived its right to arbitrate the Cash Call Issue. . . . However, this determination does not mandate reinstatement and confirmation of the arbitration awards. Rather, upon remand, the court is instructed to consider the additional arguments in [GE 7400's] motions to vacate the arbitration awards as

well as Parma VTA's applications for confirmation of the arbitration awards.

*Id.* at ¶ 22.

{¶ 10} In May 2022, Phase II of the trial commenced before a jury.[2] Prior to the start of trial, GE 7400 sought to exclude references to the acquisition loan and the Ladder Capital loan, including Parma VTA's expert report. The expert's report included calculations regarding the amounts that GE 7400 allegedly owed to Parma VTA pursuant to the acquisition loan and the Ladder Capital loan. The trial court denied the motion and determined that it was permissible to discuss these loans at trial.

> During Phase II, GE 7400 maintained that it had not been paid any rental payments since the TIC [A]greement had been signed and sought to prove that Parma VTA owed it these outstanding rental payments. This was the main argument in the breach-of-contract action against Parma VTA.
>
> Parma VTA's expert . . . testified in rebuttal that GE 7400 owed Parma VTA $2,600,000 for the acquisition loan and $4,800,000 for the Ladder Capital loan. He testified that $7,400,000 should be deducted from any amount that appellees found was due in mostly rental income to GE 7400.
>
> Parma VTA maintained that from the signing of the TIC [A]greement through the trial, the tenants of the property had paid $14,009,325 in rental payments. [The expert] testified that after business expenses and payments, GE 7400 and Parma VTA were entitled to $8,275,641 in take-home payments. Since GE 7400 was the 76.62 percent owner of the interest in the property, it was entitled to $6,340,795 of that amount. However, because [GE 7400] owed [Parma VTA] $2,600,000 for the acquisition loan and $4,800,000 for the Ladder Capital loan, they were not entitled to any of that amount.

---

[2] Prior to the Phase II portion of the trial, the court ordered that Parma VTA's counterclaim be dismissed in its entirety.

> In its charge to the jury, the trial court stated that [GE 7400] had the burden of 'prov[ing] the facts necessary for their breach of contract, breach of fiduciary duty, and civil conspiracy claims by a preponderance of the evidence.' (Tr. 937.) The court instructed that fraudulent conveyance was to be proven by clear and convincing evidence. At the close of trial, the jury found fully in favor of [Parma VTA] on [GE 7400's] claims for breach of contract, fraudulent conveyance, and breach of fiduciary duty.

*Gerston IV* at ¶ 32-35.

{¶ 11} After the conclusion of Phase II, GE 7400 filed motions for judgment notwithstanding the verdict and for a new trial. The trial court denied both motions. GE 7400 then initiated the appeal in *Gerston IV*. On appeal, we found that "the record contains substantial evidence supporting that Parma VTA did not breach the TIC agreement nor did it breach any fiduciary duty" because while GE 7400 "presented evidence that it was entitled to distributions in the amount of $6,340,795 that appellees withheld[, Parma VTA also] presented evidence to the contrary demonstrating that GE 7400 had received all of the 'distributions' to which it was entitled, but that the distributions were applied to the outstanding debts required to maintain ownership of the property." *Gerston IV* at ¶ 45, 48.

{¶ 12} We further found that Parma VTA did not breach its fiduciary duty to GE 7400 because "there was substantial evidence (or a lack thereof) in the record upon which the jury could have found that there was no fiduciary relationship between GE 7400 and Parma VTA"; the trial court's decision was not against the manifest weight of the evidence; and the "Trust's proposed findings of fact and conclusions of law were not against the manifest weight of the evidence." *Id.* at ¶ 53;

62; 69. Thus, we concluded that "the trial court's judgments granting declaratory judgment in the Trust's favor and denying the [GE 7400's] motion for a new trial are affirmed." *Id.* at ¶ 70.

### B. Post-*Gerston IV*

{¶ 13} Following our decision in *Gerston IV*, the only remaining issue left for the trial court to decide was whether to confirm or vacate the Arbitration Award where the arbitrator found that Parma VTA "shall receive a lien on [GE 7400's] interest in the real estate, in the amount of $4,815,623.26 as set forth in paragraphs numbered 10 through 14 of the Robbins Affidavit to which paragraphs the [GE 7400] has stipulated as true. In addition, [Parma VTA] is awarded as a lien interest on the lien at the rate of 12% per annum from March 18, 2019." (Arbitration Award, Dec. 30, 2019.)

{¶ 14} The arbitrator found that: (1) GE 7400 has acknowledged "its responsibility for the Ladder mortgage first to the Eighth District Court of Appeals and then again in arbitration. Before the Eighth District Court of Appeals the Respondent stated that it 'does not disclaim its share of responsibility of the obligation to Ladder Capital for the refinancing [and does] not seek to undo the payoff of the Global loan.' Later a Parma 7400 counsel stated in an e-mail 'Kimberlee A. Gerston, owner of Parma 7400 LLC hereby acknowledges the obligation of Parma GE 7400 LLC on the Ladder Mortgage Loan dated April 20, 2014 on the Great Eagle property, and the cash call made by the managers of this TIC'"; (2) "[t]he allegedly nefarious actions of [Parma VTA] and its owner to

acquire the Ladder loan are at this point irrelevant"; and (3) "Section 4.2 of the TIC provides that where a tenant fails to pay funds for the ownership, operation and maintenance of the property, the other tenant in common may pay the amount and is entitled to a lien against the non-paying tenant's interest in the property." (Arbitration Award, Dec. 30, 2019.)

{¶ 15} In a thorough, nine-page decision, the trial court confirmed the Arbitration Award in favor of Parma VTA and denied GE 7400's motion to vacate. In its decision, the court ordered that shall Parma GTA receive a lien on GE 7400's interest in the real estate in the Property in the amount of $4,815,623.26. Additionally, the court awarded Parma VTA interest on the lien at the rate of 12% per annum from March 18, 2019. The court further awarded Parma VTA $105,144.06 for its fees, expenses, and attorney fees as sought in its application to the arbitrator in January 2020.

{¶ 16} In reaching its decision, the court addressed GE 7400's two remaining arguments — "(1) 'The Arbitrator's Award Ignores the Express and Unambiguous Terms of the TIC Agreement' and (2) 'Parma GE 7400 Did Not Agree To Help Parma VTA Pay its Loan With Ladder Capital.'" (Judgment Entry, Oct. 24, 2024.) The court acknowledged that "[a]ccepting either of these arguments would . . . exceed the powers of this Court, given the very limited scope of review provided to courts of common pleas in reviewing awards of arbitrators. In addition, neither argument, even if accepted as true, would suffice to invalidate the awards

made by an arbitrator selected by the parties, pursuant to their TIC Agreement (defined below), to decide their disputes." (Judgment Entry, Oct. 24, 2024.)

{¶ 17} Specifically, the court stated that under R.C. 2711.10(D), a trial court may vacate an arbitration award only if: "[t]he arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." R.C. 2711.10. The court noted that GE 7400:

> has not alleged that [the arbitrator's award] should be vacated because of subsections (A), (B), or (C). It has not alleged that [the arbitrator] "imperfectly executed" his powers in such a way "that a mutual, final, and definite award upon the subject matter submitted was not made." Rather, [GE 7400] argues that [the arbitrator] "lacked jurisdiction" and "the arbitrator's award conflicts with the express terms of the parties" contract.' [GE 7400's] Motion to Vacate at 1. The former jurisdictional argument is meritless. The latter "conflicting term" argument is not a legal basis upon which an arbitration award may be vacated.

(Judgment Entry, Oct. 24, 2024.)

{¶ 18} In reviewing the terms of the TIC Agreement, the court found that:

> Section 4.2 of the TIC Agreement create[d] an absolute responsibility for each tenant in common to meet cash calls for "any future cash needed in connection with the ownership, operation and maintenance of the Property as determined by the Property Manager [Parma VTA]." . . . In its capacity as Property Manager, Parma VTA issued cash calls in early 2019 to pay off a First Mortgage Loan held by Ladder Capital, which was rapidly coming due. As [the arbitrator] recognized, these cash calls were absolutely legitimate functions under the standards set forth in the TIC Agreement — again, a document that both parties had agreed to. In fact, the cash calls were necessary to maintain the TIC's ownership of the Property. The cash — all of which Parma VTA provided — succeeded in preventing a foreclosure by Ladder Capital and resulted in the TIC owning the Property free and clear of the first mortgage loan.

Parma VTA actually paid the entire amount of the Ladder Capital loan that came due. The pay-off occurred in June of 2019. GE 7400 failed to respond to the required cash calls. Thus, Parma VTA advanced GE 7400's share of the mortgage loan payoff.

[GE 7400] admitted receiving the cash call yet failed to pay as required by the terms of the TIC Agreement. [GE 7400] repeatedly acknowledged it was obligated to pay its share of the Ladder Capital mortgage loan.

The TIC Agreement clearly delineates what happens when a tenant in common fails to pay its "pro rata share" of "cash needed in connection with the ownership, operation and maintenance of the Property as determined by the property manager." When GE 7400 failed to pay the cash required, Parma VTA was automatically entitled to a lien against GE 7400's interest in the Property in the full amount advanced on behalf of GE 7400's interest: $4,815,623.86 plus 12% interest per annum until paid. This requirement is taken chapter and verse from Section 4.2 of the parties' TIC Agreement.

There is no injustice or impropriety regarding the lien [the arbitrator] awarded. Rather, this case was mechanically determined by virtue of the parties' contract. In essence, the parties pre-bargained the outcome should a party to the contract fail to pay its share of a cash call. In 2019, GE 7400 failed to pay its contractual share of the cash call; thus, its interest in the Property was subjected to a lien in the amount it failed to pay. The contract specified the consequences of GE 7400's failures to pay. [The arbitrator's] award simply applied the requirements of the parties' TIC Agreement.

Therefore, even if this Court had the power to review [the arbitrator's] reasoning and awards, there would be no basis to vacate his conclusions.

(Judgment Entry, Oct. 24, 2024.)

{¶ 19} It is from this order that GE 7400 appeals, raising the following four assignments of error for review:

**Assignment of Error I:** The trial court committed reversible error as a matter of law by misstating and misapplying the applicable standards of review for confirming or vacating the arbitration awards in this case.

**Assignment of Error II:** The trial court committed reversible error as a matter of law by failing to vacate the arbitration awards in this case because they conflict with the unambiguous and express terms of the TIC Agreement.

**Assignment of Error III:** The trial court committed reversible error as a matter of law because the alleged "representations" on which [Parma] VTA claims to have relied violate the Statute of Frauds.

**Assignment of Error IV:** The trial court committed reversible error as a matter of law and violated GE 7400's due process rights by permitting [Parma] VTA to receive an impermissible double recovery from GE 7400.

## II. Law and Analysis

{¶ 20} As an initial matter, we note that the scope of this appeal is limited to the review of the confirmation of the Arbitration Award in favor of Parma VTA.

### A. Standard of Review

{¶ 21} *In Portage Cty. Bd. of Dev. Disabilities v. Portage Cty. Educators' Assn. for Dev. Disabilities*, 2018-Ohio-1590, the Ohio Supreme Court held that "[w]hen reviewing a decision of a common pleas court confirming, modifying, vacating, or correcting an arbitration award, an appellate court should accept findings of fact that are not clearly erroneous but decide questions of law de novo." *Id.* at syllabus, citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995). Our de novo review on appeal, however, is not a de novo review of the merits of the dispute as presented to the arbitrator. *Zeck v. Smith Custom Homes & Design, LLC*, 2022-Ohio-622, ¶ 12 (8th Dist.), citing *Adams Cty./Ohio Valley Local School v. OAPSE/AFSCME, Local 572*, 2017-Ohio-6929, ¶ 18 (4th Dist.), citing *Jackson Cty., Ohio Sheriff v. FOP Ohio Labor Council, Inc.*, 2004-Ohio-3535, ¶ 19-20 (4th Dist.).

Rather, we review the trial court's decision whether to vacate an arbitration award "de novo to see whether any of the statutory grounds for vacating an award exist." *Id.*

**B. R.C. 2711.10(D) and "Arbitrators Exceeded their Powers"**

{¶ 22} R.C. Ch. 2711 governs the grounds to challenge an arbitration award. Relevant to the instant case, R.C. 2711.10(D) requires an arbitration award to be vacated when the arbitrators "exceeded their powers. . . . " Whether an arbitrator has exceeded their authority under R.C. 2711.10(D) is a "'question of law'" that is reviewed de novo. *Portage Cty.* at ¶ 25, quoting *Green v. Ameritech Corp.*, 200 F.3d 967, 974 (6th Cir.2000).

{¶ 23} An arbitrator exceeds their authority in rendering an award if the award does not draw its essence from the contract. *Queen City Lodge No. 69, FOP, Hamilton Cty., Ohio, Inc. v. Cincinnati*, 63 Ohio St.3d 403, 406 (1992) (citations omitted). The Ohio Supreme Court has found that an arbitrator's award departs from the essence of the contract when: "(1) the award conflicts with the express terms of the agreement, and/or (2) the award is without rational support or cannot be rationally derived from the terms of the agreement." *Ohio Office of Collective Bargaining v. Ohio Civ. Serv. Emp. Assn., Local 11, AFSCME, AFL-CIO*, 59 Ohio St.3d 177 (1991), paragraph one of the syllabus.

{¶ 24} On the other hand, "[a]n arbitrator's award draws its essence from a[n] . . . agreement when there is a rational nexus between the agreement and the award, and where the award is not arbitrary, capricious, or unlawful." *Mahoning*

*Cty. Bd. of Mental Retardation & Dev. Disabilities v. Mahoning Cty. TMR Edn. Assn.*, 22 Ohio St.3d 80 (1986), paragraph one of the syllabus. "'"Once it is determined that the arbitrator's award draws its essence from the [agreement] and is not unlawful, arbitrary, or capricious, a reviewing court's inquiry for purposes of vacating an arbitrator's award pursuant to R.C. 2711.10(D) is at an end."'" *Zeck*, 2022-Ohio-622, at ¶ 14, quoting *Adams Cty./Ohio Valley Local School* 2017-Ohio-6929, at ¶ 20 (4th Dist.), quoting *Bd. of Edn. of the Findlay City School Dist. v. Findlay Edn. Assn.* 49 Ohio St.3d 129 (1990), paragraph two of the syllabus.

{¶ 25} In its first assignment of error, GE 7400 argues that the trial court erred to its prejudice when it used a much more deferential standard of reviewing the Arbitration Award. GE 7400 cites to *Cedar Fair, L.P. v. Falfas*, 2014-Ohio-3943, and *Ohio Office*, for the proposition that trial courts should vacate arbitration awards when they contravene the unambiguous terms of the parties' contract. GE 7400 contends that the trial court "decided this case as though *Cedar Fair*, *Ohio Office*, and the rest of the Ohio Supreme Court's jurisprudence on this issue over the last thirty years never happened." (GE 7400's Appellate Brief, p. 16.) We disagree, and in our de novo review, we do not find that the trial court misapplied the applicable standard of review.

{¶ 26} Here, the court considered the statutory grounds to vacate an arbitration award in R.C. 2711.10 and recognized that subsection (D) was at issue. The court also recognized that if an arbitrator's award draws from the essence of the agreement and is not unlawful, arbitrary or capricious, a reviewing court's inquiry

for purposes of vacating an arbitration award is at an end. (Judgment Entry, Oct. 24, 2024.) The court then addressed GE 7400's two remaining arguments: "(1) 'The Arbitrator's Award Ignores the Express and Unambiguous Terms of the TIC Agreement' and (2) 'Parma GE 7400 Did Not Agree To Help Parma VTA Pay its Loan With Ladder Capital.'" (Judgment Entry, Oct. 24, 2024.) The court aptly acknowledged that "[a]ccepting either of these arguments would . . . exceed the powers of this Court, given the very limited scope of review provided to courts of common pleas in reviewing awards of arbitrators. In addition, neither argument, even if accepted as true, would suffice to invalidate the awards made by an arbitrator selected by the parties, pursuant to their TIC Agreement (defined below), to decide their disputes." The court analyzed Section 4.2 of the TIC Agreement and found that the cash calls were legitimate functions under the standards set forth in the parties' agreement. The court determined that the arbitrator did not exceed his powers.

{¶ 27} While the trial court may not have relied on the specific cases cited by GE 7400, the court still properly considered the statutory grounds and case law for vacating an arbitration award, agreed with the arbitrator's findings, and determined that the arbitrator did not exceed his authority.

{¶ 28} Therefore, the first assignment of error is overruled.

**C. The Express Terms of the TIC**

{¶ 29} In its second assignment of error, GE 7400 argues that the Arbitration Award should be vacated because the award conflicts with the express and unambiguous terms of the TIC Agreement. Specifically, GE 7400 claims that

the TIC Agreement is unambiguous in that Parma VTA had no right to bind GE 7400 to a loan without GE 7400's consent under sections 1.4 and 2.1. Whereas, Parma VTA argues, and the arbitrator and trial court found that, "Section 4.2 of the TIC Agreement creates an absolute responsibility for each tenant in common to meet cash calls for 'any future cash needed in connection with the ownership, operation and maintenance of the Property as determined by the Property Manager.' . . . As [the arbitrator] recognized, these cash calls were absolutely legitimate functions under the standards set forth in the TIC Agreement — again, a document that both parties had agreed to." (Judgment Entry, Oct. 24, 2024.)

{¶ 30} Sections 1 and 2 of the TIC Agreement provide in relevant part:

1.4 <u>No Agency.</u> No Tenant in Common is authorized to act as agent for, to act on behalf of, or to do any act that will bind, any other Tenant in Common, or to incur any obligations with respect to the Property.

. . .

2. <u>Management</u>

. . .

2.1 Each Tenant in Common shall manage all facets of the business and affairs of such Tenant in Common's Interest. Any sale of the entire Property, any lease or re-lease of all or any portion of the Property, any negotiation, re-negotiation and approval of any indebtedness secured by any mortgage or deed of trust recorded against the entire Property, and the hiring of any property manager for the Property and the negotiation, re-negotiation, and approval of any management contract or agreement with any such property manager (and any extension or renewal of any such contract or agreement), shall require the *unanimous approval* of all Tenants in Common.

. . .

2.2 [Parma VTA] is hereby designated as Property Manager[.]

(Emphasis added.)

{¶ 31} Section 4 of the TIC Agreement provides in pertinent part:

4. Co-Tenant's Obligations. The Tenants in Common each agree to perform such acts as may be reasonably necessary to carry out the terms and conditions of this Agreement, including, without limitation:

. . .

4.2 Additional Funds. Each Tenant in Common will be responsible for a pro rata share (based on each Tenant in Common's respective Interest) of *any future cash needed in connection with the ownership, operation and maintenance of the Property as determined by the Property Manager*. To the extent any Tenant in Common fails to pay any funds pursuant to this Section within fifteen (15) days after the Property Manager delivers notice that such additional funds are required, any other Tenant(s) in Common may pay such amount. The nonpaying Tenant in Common shall reimburse the paying Tenant(s) in Common upon demand the amount of any such payments plus interest thereon at the rate of twelve percent (12%) per annum (but not more than the maximum rate allowed by law) until paid. Alternatively, the Property Manager is hereby authorized to pay the Tenant(s) in Common entitled to reimbursement the sums advanced (with interest thereon as provided above) out of future cash from operations or from sale or refinancing of the Property. The remedies against a nonpaying Tenant in Common provided for herein are in addition to any other remedies that may otherwise be available, including by way of illustration, but not limitation, *the right to obtain a lien against the Interests of the nonpaying Tenant in Common to the extent allowed by law.*

(Emphasis added.)

{¶ 32} Relying on *Garofoli v. Whiskey Island Partners, Ltd.*, 2014-Ohio-5433, (8th Dist.), GE 7400 argues that the specific language requiring "unanimous approval" for loans encumbering the Property necessarily "controls" and prevails over the general language of Section 4.2 permitting VTA to make decisions on

regular expenditures.[3] As a result, GE 7400 contends the arbitrator lacked authority to ignore the TIC Agreement's express requirement of unanimous approval for a loan encumbering the Property, and the trial court erred in failing to vacate the Arbitration Award because it conflicts with the express terms of the agreement. We disagree.

{¶ 33} In the matter before us, the arbitrator reviewed the evidence, discussed the relevant terms of the TIC, offered his basis for how he construed the contract, and provided the basis for the award. Specifically, with regard to Section 1.4 of the TIC Agreement, the arbitrator determined that GE 7400's actions arose "from an obligation, the assumption of the original mortgage, that [GE 7400] executed and for which [GE 7400] was responsible. [GE 7400] has twice acknowledged its responsibility for the Ladder Capital mortgage which paid off the original note and mortgage. Consequently, [Parma VTA's] pay-off of the Ladder Capital note and mortgage did not create any new obligation with respect to the property. Moreover there is no evidence that [GE 7400] appointed [Parma VTA] as its agent." (Arbitration Award, Dec. 30, 2019.)

{¶ 34} The arbitrator further determined that Section 4.2 of the TIC Agreement does not only apply to the day-to-day operations of the real estate as GE 7400 contended. The arbitrator determined that there is "no such limiting language in paragraph 4.2. Mortgages involve the ownership and operation of the

---

[3] In *Garofoli*, we stated, "'[it] is well established that where a general provision in a contract conflicts with a specific provision, the specific provision controls.'" *Id.* at ¶ 29, quoting *Hedrick v. Spitzer Motor City, Inc.*, 2007-Ohio-6820, ¶ 16 (8th Dist.).

real estate. Nor is Section 4.2 limited by the requirement of unanimous consent to a mortgage. Indeed Section 4.2 may anticipate a situation as here where a tenant refuses to give consent, and such refusal seriously implicates the ownership and operation of the venture." (Arbitration Award, Dec. 30, 2019.)

{¶ 35} Ultimately, the arbitrator found that: (1) Parma VTA and GE 7400 were tenants in common under the TIC Agreement; (2) the parties paid for the Property by assuming a mortgage to Principal Global and with cash advanced by Parma VTA; (3) the initial mortgage became due in 2014; (4) Principal Global refused to refinance the loan; (5) Principal Global's refusal to refinance was based on the litigation pending between the parties, GE 7400's lack of financial strength, and the interest rate on the refinancing would have required an additional $1,000,000 to buy down the rate; (6) Parma VTA executed a mortgage to Ladder Capital to pay off the Principal Global mortgage; (7) GE 7400 did not participate in the Ladder Capital mortgage; (8) the Ladder Capital mortgage became due in 2019, and was paid off solely by Parma VTA; (9) Parma VTA (as the Property Manager) sought GE 7400's participation in the cash call for the Ladder Capital mortgage; (10) GE 7400 did not respond to the cash call; and (11) GE 7400 has twice acknowledged its responsibility for the Ladder Capital mortgage. (Arbitration Award, Dec. 30, 2019.)

{¶ 36} In his decision, the arbitrator also rejected GE 7400's complaints about "the allegedly nefarious actions of [Parma VTA] and its owner to obtain the Ladder loan." (Arbitration Award, Dec. 30, 2019.) The arbitrator determined these

actions are irrelevant at this point because this court decided that the Trust was the owner of GE 7400. The arbitrator found meaningful the fact that the failure to pay off the Principal Global loan would have extinguished GE 7400's interest in the Property.

{¶ 37} Based on the foregoing, we do not find that the arbitrator "exceeded his powers." The Arbitration Award drew its essence from the TIC Agreement, can be rationally derived from the terms of the agreement, and the award is not arbitrary capricious, or unlawful. *Zeck,* 2022- Ohio-622, at ¶ 14. The arbitrator did not disregard the plain meaning of Sections 1.4, 2.1, and 4.2 of the TIC Agreement. Rather, the arbitrator acknowledged that while the TIC Agreement provides that a mortgage indebtedness required the unanimous consent of the parties, the fact remained that GE 7400 twice acknowledged its responsibility for the Ladder Capital mortgage and Parma VTA, as the Property Manager, sought GE 7400's participation in the cash call for the Ladder Capital mortgage, GE 7400 did not respond to the cash call, under Section 4.2 of the TIC Agreement, Parma VTA is entitled to a lien against GE 7400's interest in the Property for its failure to pay, and there is no evidence that GE 7400 appointed Parma VTA as its agent.

{¶ 38} Furthermore, we note that GE 7400's claims appear to be an attack on the merits of the award, which is disallowed by the narrow scope of judicial review of arbitration awards. *Motor Wheel Corp. v. Goodyear Tire & Rubber Co.*, 98 Ohio App.3d 45, 51-52 (8th Dist. 1994) (where we stated, "[t]he limited scope of judicial review of arbitration decisions comes from the fact that arbitration is a creature of

contract. . . . If parties cannot rely on the arbitrator's decision (if a court may overrule that decision because it perceives factual or legal error in the decision), the parties have lost the benefit of their bargain."). Moreover, a reviewing court cannot reject an arbitrator's findings of fact or interpretation of the agreement simply because it disagrees with them. *Cleveland v. Cleveland Police Patrolmen's Assn.*, 2016-Ohio-702, ¶ 23 (8th Dist.), citing *Southwest Ohio Regional Transit Auth. v. Amalgamated Transit Union, Local 627*, 91 Ohio St.3d 108, 110 (2001); *Zeck* at ¶ 23.

{¶ 39} Thus, based on the foregoing, the second assignment of error is overruled.

### D. "Representations" by GE 7400 and the Statute of Frauds

{¶ 40} In the third assignment of error, GE 7400 argues the trial court committed reversible error because the "representations" on which Parma VTA relied violate the Ohio Statute of Frauds.

{¶ 41} Under R.C. 1335.05, "[n]o action shall be brought . . . upon a special promise, to answer for the debt, default, or miscarriage of another person . . . unless the agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged. . . ." To satisfy the Statute of Frauds, the signed memorandum must:

> (1) identif[y] the subject matter of the agreement, (2) establish[] that a contract has been made; and (3) state[] the essential terms with reasonable certainty." *Kling v. Bordner* (1901), 65 Ohio St. 86, 61 N.E. 148, paragraph one of the syllabus; see also *North Coast Cookies, Inc. v. Sweet Temptations, Inc.* (1984), 16 Ohio App.3d 342, 349, 476 N.E.2d 388, 16 Ohio App.3d 342, 349 (8th Dist. 1984), citing 1 Restatement of the Law 2d, Contracts (1981) 336, Section 131. It does

not have to be a formal memorial of the agreement nor does it need to contain all the terms of the agreement. Rather, a signed acknowledgment of an oral promise can qualify as a memorandum that satisfies the statute, even if the acknowledgment repudiates the oral promise. Restatement, supra, at 347, Section 133, Illustration 4. *North Coast Cookies*, 16 Ohio App.3d at 349.

*Landskroner v. Landskroner*, 2003-Ohio-5077, ¶ 23 (8th Dist.).

{¶ 42} According to GE 7400, the "representations" on which Parma VTA relied on to assert that GE 7400 agreed to answer for Parma VTA's debt to Ladder Capital do not satisfy the Statute of Frauds because they do not "state the essential terms with reasonable certainty." GE 7400 maintains that these "representations" do not establish that Parma VTA agreed to do anything in consideration for GE 7400's alleged promise and do not establish a contract.

{¶ 43} GE 7400 made these same arguments to the arbitrator, who disagreed with GE 7400 and concluded that GE 7400's "acknowledgement of its obligation for the Ladder Capital mortgage contained sufficient specificity to satisfy the Statute of Frauds. The common construction of 'its share of the obligation' would mean [GE 7400's] interest in the real estate." (Arbitration Award, Dec. 30, 2019.) The arbitrator reasoned:

> the fact remains that [GE 7400] has since twice acknowledged its responsibility for the Ladder mortgage first to the Eighth District Court of Appeals and then again in arbitration. Before the Eighth District Court of Appeals the [GE 7400] stated that it "does not disclaim its share of responsibility of the obligation to Ladder Capital for the refinancing [and does] not seek to undo the payoff of the Global loan." Later a [GE 7400's] counsel stated in an e-mail "Kimberlee A. Gerston, owner of [GE 7400] hereby acknowledges the obligation of [GE 7400] on the Ladder Mortgage Loan dated April 20, 2014 on the Great Eagle property, and the cash call made by the managers of this TIC."

(Arbitration Award, Dec. 30, 2019.)

{¶ 44} Given that GE 7400 provided acknowledgements to Parma VTA on more than one occasion and with reasonable certainty, we do not find that the arbitrator's decision violated the Statute of Frauds, nor did the arbitrator exceed his authority. Therefore, the third assignment of error is overruled.

### E. Double Recovery

{¶ 45} In the fourth assignment of error, GE 7400 argues that the trial court's confirmation of the Arbitration Award effectively imposed a double recovery from GE 7400 and in Parma VTA's favor for the same "damages." GE 7400 claims that at the time the arbitrator determined it owed a $4.8 million share of Parma VTA's total repayment of the Ladder Capital loan, and ordered a lien to be imposed in that amount, Parma VTA already collected and kept $8,607,511 of GE 7400's share of the net cash flow from the total rental income. Therefore, GE 7400 contends that Parma VTA had been fully reimbursed for GE 7400's "share" of the cash call and the imposition of the lien constitutes double recovery.

{¶ 46} We note however, that this issue was not addressed by the trial court in its review of the Arbitration Award. Indeed, the court specifically stated that only the following two issues remained before it: "(1) 'The Arbitrator's Award Ignores the Express and Unambiguous Terms of the TIC Agreement' and (2) 'Parma GE 7400 Did Not Agree To Help Parma VTA Pay its Loan With Ladder Capital.'" (Judgment Entry, Oct. 24, 2024.) While GE 7400 contends, in its reply brief, that it raised this issue in its motion for summary judgment, it did not raise this issue in its motion to

vacate the arbitration award, which is the sole focus of this appeal. Because this issue was not addressed by the trial court it in its decision confirming the Arbitration Award, we decline to address it in the first instance. *Benkovits v. Bandi*, 2021-Ohio-1877, ¶ 27 (8th Dist.) (where we declined to address arguments regarding the merits of appellant's claims, which were not addressed by the trial court in the first instance.)

{¶ 47} Thus, the fourth assignment of error is overruled.

{¶ 48} Accordingly, judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, PRESIDING JUDGE

DEENA R. CALABRESE, J., and
WILLIAM A. KLATT, J., * CONCUR

(*Sitting by assignment: William A. Klatt, J., retired, of the Tenth District Court of Appeals.)